**Janet B. JACKSON Plaintiff,**

v.

**HEALTH RESOURCES OF ROCK-VILLE, INC. D/B/A/ Fox Hill Nursing & Rehabilitation, Defendant.**

**No. CIV.A.3:03CV1453(JCH).**

United States District Court,
D. Connecticut.

Feb. 22, 2005.

Robert J. Williams, Jr., Williams & Vassallo, Suffield, CT, for Plaintiff.

Lissa J. Paris, Michael C. Harrington, Murtha Cullina LLP, Hartford, CT, for Defendant.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 34]

HALL, District Judge.

Defendant Health Resources of Rockville, Inc. d/b/a Fox Hill Nursing & Rehabilitation ("Fox Hill") brings this motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Fox Hill argues that the plaintiff, Janet B. Jackson, has offered no competent proof that raises an issue of material fact on any of Jackson's claims relating to her employment at, or dismissal from, Fox Hill. Jackson opposes the motion and asserts that she has provided enough proof to defeat a summary judgment motion on her claims. For the reasons that follow, Fox Hill's motion for summary judgment is **GRANTED**.

## I. BACKGROUND

Fox Hill is a long-term healthcare facility located in Rockville, Connecticut. *See* Pl's Local Rule 56(a)(2) Statement at ¶ A.1 ("Pl's Rule 56"). Janet Jackson, an African–American woman of Jamaican decent, began working at Fox Hill as a Certified Nurse's Aide ("CNA") in May 1999. *See* Pl's Rule 56 at ¶ A.3.

In January 2000, Fox Hill suspended Jackson after a patient named Sybil Feile accused her of rough handling. *See id.* at ¶ A.33. Fox Hill investigated the charges; obtained witness statements from Ms. Feile and several of Jackson's co-workers; and reported the incident to Feile's physician, the Department of Public Health, the State's Ombudsman's Office, and the Vernon police department.[1] *See id.* at ¶ A.35.

---

1. Jackson alleges that the Fox Hill employee who reported the incident to the state authori-

At the conclusion of the investigation, Fox Hill determined that Jackson had not roughly handled Ms. Feile and reinstated her with three days back pay. *See id.* at ¶ A.40. It turned out that the abuse was perpetrated by a white CNA. *See id.* at ¶ A.28.a. Jackson disputed the amount of back pay Fox Hill owed her, and as a result, she filed a claim with the Connecticut Commission on Human Rights and Opportunities ("CHRO") in March 2000 charging that Fox Hill had discriminated against her based on her race, color and national origin. *See id.* at ¶ A.42. Jackson and Fox Hill settled those claims, *see id.* at ¶ A.43, and Fox Hill agreed not to discriminate or retaliate against Jackson for having filed the claims, *see id.* at ¶ C.4. Following the settlement, Jackson told no one at Fox Hill that she had filed a CHRO claim. *See id.* at ¶ A.44.a. However, Fox Hill Administrator James Lopez was aware of the CHRO complaint. *See id.* at ¶ C.2.

In addition to the Feile incident, Fox Hill disciplined Jackson on several occasions for various infractions.[2] *See id.* at ¶ A.5. Several of these disciplinary actions occurred after Jackson filed her CHRO charges. Fox Hill disciplined Jackson for tardiness, leaving the building during working hours, threatening co-workers, arguing with co-workers, insubordination, poor attitude, yelling at a co-worker, and sleeping on the job. *See id.* at ¶¶ A.6—A.14. The penalties for these infractions ranged from verbal warnings to suspension. *See, e.g., id.* at ¶¶ A.8—A.12. Jackson denies the underlying allegations referred to in the disciplinary actions, except for the charges of arguing with, and yelling at, a co-worker. *See id.* at ¶¶ A. 10, A. 12.

Jackson points to several incidents as facts supporting her complaint for race discrimination. First, Jackson points to an incident where Fox Hill officials asked only the black CNAs about a situation in which a patient had not been given a bedpan. *See id.* at ¶ A.30. Jackson also alleges an incident where a white CNA screamed and was not disciplined, *see id.* at ¶ A.28.c, and an incident where two white CNAs argued but were not punished, as Jackson had been, until she complained about it to her supervisor, *see* Mem. Opp. Summ. J. at 3; *see also* Pl's Rule 56 at ¶ A.29. However, Jackson is unable to point to any facts or incidents to support her claim of discrimination based on national origin. *See, e.g., id.* at ¶ A.31.

Jackson also alleges that the disciplinary incidents are part of a pattern of harassment, and that the Fox Hill administration wanted to fire her long before her actual

---

ties, Deborah Hardy, made the report before the incident is alleged to have been reported to Hardy, as part of a plan to have Jackson fired. *See* Pl's Rule 56 at ¶ B.2 (claiming Hardy reported the event to the state on January 18, but only supposedly learned of the event on January 19). She cites the dates on documents attached to the Affidavit of Pamela Liggins, *see* Def's Rule 56(a)(1) Statement at Ex. A ("Liggins Aff."), as proving that Hardy wrote state officials about "future events." *See id.* However, the report that Jackson points to as evidence that Hardy reported the Feile situation prior to being alerted to it having happened, *see* Liggins Aff. at Ex. 14 (Record of Resident and Family Concerns—dated January 19, 2000), appears to be the Feile witness statement taken by Hardy, cited in Fox Hill's 56(a)(1) Statement. *See* Def's Rule 56(a)(1) Statement at ¶ 35. The document itself refers to the event as having taken place "several weeks ago" and that the CNA in question had already been suspended pending an investigation. *See* Liggins Aff. at Ex. 14 (Record of Resident and Family Concerns—dated January 19, 2000). Jackson herself places her date of suspension on January 10, 2000. *See* Pl's Rule 56 at Ex. A, ¶ 4 ("Jackson Aff.")

2. Jackson admits disciplinary action was taken against her repeatedly, but denies that she deserved to be disciplined.

termination date. *See, e.g.*, Pl's Rule 56 at ¶¶ C.7, C.9. Specifically, Jackson claims "[t]hat [Fox Hill] Administrators wanted Janet Jackson terminated because of her concerns about patient care." *See id.* at ¶ C.10. In addition to the disciplinary incidents, Jackson alleges that she was told to mind her own business when she complained about patient care, which she did vocally and often, *see id.* at ¶¶ C.13—C.14; was told to keep her comments to herself; and was made the butt of jokes and racial comments, including being referred to as "monkey" on one occasion. *See id.* at ¶ C.8. Jackson also alleges that a pool aide named Ella Huff was instructed by Fox Hill personnel, including an administrator, a supervisor, the Director of Nursing, and two nurses, to falsify an affidavit about Jackson. *See id.* at ¶ C.11.

Jackson claims that her CHRO complaint affected her performance reviews. According to Jackson, Fox Hill Administrator James Lopez knew about the CHRO complaint. *See id.* at ¶ C.3. She claims she received satisfactory performance appraisals prior to her CHRO complaint, but began receiving deficient appraisals afterwards. *See id.* at ¶¶ C.5—C.6. Jackson's witness, Bernard Wright, claims Lopez thought Jackson caused a lot of problems at Fox Hill. *See id.* at ¶ B.13. That same witness heard Lopez describe Jackson as a "pain in the ass." *See* Pl's Rule 56 at Ex. O, 31 ("Wright Depo."). However, other than Lopez, Jackson knows of nobody else at Fox Hill who knew of her CHRO complaint, *see* Pl's Rule 56 at ¶ A.54, and Lopez left Fox Hill three months before Jackson was fired. *See id.* at ¶ A.70.

Fox Hill fired Jackson following a patient care incident in February 2001. According to Jackson's admissions, she was responsible for the care of a seventy-nine year-old patient on February 10, 2001. *See id.* at ¶ A.16. The patient's call light went off on that evening, and Jackson got up to check on him, despite of the fact that she was on her break at that time. *See id.* at ¶ A.18. Fox Hill CNA's are paid during their breaks and are expected to provide assistance to patients in need even if on a break. *See id.* at ¶ A.19. "She told [the patient] that she was on break, but would tell the Charge Nurse to have someone change him." *See id.* at ¶ A.18. In fact, several aides reported that she began incontinent care on the patient, but then left the room before completing it, leaving him in a mess. *See id.* at ¶ A.22. Jackson admits that CNAs are expected to provide assistance to patients in need even if they are on break. *See id.* at ¶ A.19.

Fox Hill suspended Jackson following the incident, pending an investigation for suspected patient neglect. *See id.* at ¶ A.20. After Director of Nursing Services Suzette Works obtained written statements from several witnesses, Fox Hill determined that patient neglect had occurred, and it reported the incident to the Connecticut Department of Public Health and the State Ombudsman's Office on February 14, 2001. *See id.* at ¶¶ A.21, A.23. On that same day, Fox Hill terminated Jackson. *See id.* at ¶ A.24. Works and Francis Mozea, Jr., Fox Hill's administrator at the time, informed Jackson of her termination. *See id.* at ¶ A.25.

In August 2001, Jackson filed a second CHRO charge alleging discrimination based on race, color, and national origin, and retaliation for the March 2000 CHRO complaint. *See id.* at ¶ A.26. She commenced the suit at bar in August 2003. *See id.* at ¶ A.27.

## II. STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See,*

FED.R.CIV.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir.2000). A court must grant summary judgment " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact ....' " *Miner v. Glens Falls*, 999 F.2d 655, 661 (2d Cir.1993) (citation omitted). A dispute regarding a material fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505), *cert. denied,* 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich*, 963 F.2d at 523. "In discrimination cases where state of mind is at issue, [the Second Circuit] affirm[s] a grant of summary judgment in favor of an employer sparingly because 'careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination.' " *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir.2003) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.2000)). However,

"[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). *See also Suburban Propane v. Proctor Gas, Inc.,* 953 F.2d 780, 788 (2d Cir.1992). A party may not create a genuine issue of material fact by presenting contradictory or unsupported statements. *See Securities & Exchange Comm'n v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978). Nor may he rest on the "mere allegations or denials" contained in his pleadings. *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). *See also Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993) (holding that party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible).

However, when deciding a summary judgment motion in the discrimination context, a district court must be cautious about granting an employer's motion when intent is at issue. *See Gallo v. Prudential Residential Services, LP,* 22 F.3d 1219, 1224 (2d Cir.1994). "Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.* That being said, litigants in the District of Connecticut must comply with Local Rule 56 which requires a party opposing summary judgment to clearly list

each disputed material issue of fact and cite to admissible evidence in the record to support each fact, or risk entry of summary judgment against them. *See* Conn. Loc. R. Civ. P. 56.

## III. DISCUSSION

Jackson makes several claims against Fox Hill in relation to her February 2001 termination. First, she claims that Fox Hill violated her civil rights by firing her on the basis of her race, color, or national origin in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e—2000e–17 ("Title VII"); 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991; and Conn. Gen. Stat. §§ 46a–58(a), 46a–60(a)(1)—(a)(4) ("CFE-PA"). In addition, Jackson claims Fox Hill fired her in retaliation for her having filed a CHRO complaint in March 2000 and in violation of these same statutes and Connecticut public policy. Jackson also claims that Fox Hill subjected her to harassment and a hostile work environment. Finally, Jackson claims that Fox Hill both negligently and intentionally inflicted emotional distress upon her by falsely accusing her of patient neglect, disciplining her unfairly, and terminating her for patient abuse.

Fox Hill denies these claims and argues that it fired Jackson because she neglected a patient's needs during the February 10, 2001 incident. It asserts that no material facts are in dispute with regards to Jackson's dismissal, or her treatment by Fox Hill. Fox Hill bears the burden of proving that there are no issues of material fact in dispute on any of Jackson's claims. *See Anderson*, 477 U.S. at 256, 106 S.Ct. 2505.

### A. Employment Discrimination Based on Race, Color, or National Origin

█ Employment discrimination claims, whether brought pursuant to Connecticut or federal statutes, are analyzed using the burden shifting analysis laid out by the Supreme Court in *McDonnell Douglas Corp. v. Green. See* 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (using burden shifting analysis to examine a Title VII claim); *see also Levy v. Comm'n on Human Rights & Opportunities*, 236 Conn. 96, 107–108, 671 A.2d 349 (1996) (using the *McDonnell Douglas* burden shifting analysis to examine a discrimination claim under Conn. Gen. Stat. § 46a–60). Jackson must first prove a *prima facie* case of discrimination based on race, color, or national origin. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. In order to meet her initial burden under *McDonnell Douglas*, Jackson must show that 1) she belonged to a protected class; 2) she was qualified for the position she held; 3) she suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.2003); *see also McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. This initial burden is not onerous. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

█ Once Jackson proves a *prima facie* case, the burden of production shifts to Fox Hill to " 'articulate some legitimate, nondiscriminatory reason for the employee's [termination].' " *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817). If Fox Hill articulates a legitimate, non-discriminatory reason, the burden shifts back to Jackson to prove by a preponderance of the evidence that Fox Hill's articulated reason is not the actual reason Jackson was fired, but merely a pretext promulgated to mask the true discriminatory reason. *See id.* In order to prove that an otherwise acceptable reason is a pretext for discrimination, Jackson must

show " '*both* that the reason was false, *and* that discrimination was the real reason.' " *Gallo,* 22 F.3d at 1225 (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

Fox Hill does not appear to dispute Jackson's ability to put forth a *prima facie* case of discrimination on the grounds of race and color. The court agrees. The record reflects that Jackson is an African-American of Jamaican descent who was qualified to be a CNA, and there can be no argument that termination fails to qualify as an adverse employment action.

■ Jackson relies on several allegations as support for an inference of discriminatory intent.[3] First, Jackson relies on the January 2000 suspension she received when a patient wrongly accused her of abuse, abuse that officials eventually found to have be committed by a white CNA. *See* Pl's Rule 56 at ¶ A.28.a. Second, Jackson relies on several incidents in which she claims white employees were not disciplined for engaging in activities that Jackson had been disciplined for engaging in, namely arguing and screaming. *See id.* at ¶¶ A.28.b.—A.28.c. Third, Bernard Wright testified in his deposition that some nurses at Fox Hill made fun of Jackson by calling her "monkey" because in their eyes she looked like a monkey. *See* Wright Depo. at 34. These incidents are sufficient to satisfy the *de minimis* initial evidentiary requirements under *McDonnell Douglas. See McLee v. Chrysler Corp.,* 109 F.3d 130, 134 (2d Cir.1997). Jackson has made a *prima facie* case of race and color discrimination.

■ However, Jackson was unable to point to any evidence through which to infer that her Jamaican ancestry played a role in her termination. *See* Pl's Rule 56

at ¶ A.31. During her deposition, Jackson could not point to any incident in which her Jamaican ancestry played a part in any alleged harassment or her termination. *See* Pl's Rule 56 at Ex. A, 185–87 ("Jackson Depo."). She merely claimed that she *felt* that her ancestry played a role in her treatment by Fox Hill. *See* Jackson Depo. at 187. This is insufficient to meet even the minimal initial standard under *McDonnell Douglas.* Fox Hill's summary judgment request as to Jackson's claim of employment discrimination based on national origin is granted.

■ Jackson's *prima facie* showing on her race and color discrimination charges shifts the burden to Fox Hill to offer a legitimate, non-discriminatory reason for terminating Jackson. *See Terry,* 336 F.3d at 138. Fox Hill argues that it fired Jackson because of her failure to care for a patient in February 2001, not because of her race or color. *See* Mem. Supp. Summ. J. at 15. Fox Hill argues that it investigated the events of February 10, 2001, and obtained the statements of four of Jackson's co-workers confirming that Jackson had failed to care for the patient because she was "on break." *See id.* According to Fox Hill, these statements, combined with Jackson's own admission that she was responsible for that patient on the evening in question, *see* Pl's Rule 56 at ¶ A.16, responded to his call for aid, observed that he needed care, and then decided not to provide that care because she was on a break, provided sufficient evidence of negligent patient care to warrant Jackson's termination, *see id.; see also* Pl's Rule 56 at ¶ A. 18.

Patient abuse is a legitimate, non-discriminatory reason for a CNA's termination. Fox Hill is required to offer such

3. The court notes that Jackson does not appear to press her race, color, and national origin claims in her Memorandum in Opposition. However, the court will examine her claims.

an explanation, not prove it, to shift the burden back to Jackson under *McDonnell Douglas. See Terry,* 336 F.3d at 138. It has done so here. Thus, the burden shifts back to Jackson to provide admissible evidence such that a reasonable jury could find, by a preponderance of the evidence, that Fox Hill's proffered non-discriminatory reason for Jackson's termination was a pretext. *See id.*

Jackson makes no argument in her Memorandum in Opposition that she was fired due to her race or color in violation of Title VII. *See, e.g.,* Mem. Opp. Summ. J. at 6–15. Nor does her Memorandum make an argument for discriminatory treatment under Section 1981. It merely attempts to refer back to non-existent Title VII race and color-based discrimination arguments. *See id.* at 15–16. As such, Jackson fails to come forward with sufficient evidence to suggest that Fox Hill's legitimate, non-discriminatory reason for firing her was a pretext for discrimination due to race or color. Jackson bears the burden of proof on these claims, so her claims of race and color-based discrimination under Title VII, Section 1981, and CFEPA fail. Fox Hill's motion for summary judgment on these claims is granted.

One piece of evidence, not specifically referred to by Jackson with regards to her race and color-based discrimination claims, merits mention. Jackson alleges at several points in her Memorandum that the State of Connecticut Department of Public Health ("DPH") found no deficiencies or violations with regard to the care the patient received on February 10, 2001. *See, e.g., id.* at 4, 11, 20 (citing Pl's Rule 56 at Ex. M ("DPH Report")). The implication suggested is that the State of Connecticut had "cleared" Jackson of wrongdoing and that Jackson's termination was a "pretext." An examination of plaintiff's evidence, Exhibit M of her Rule 56(a)(2) Statement, shows that this was not the case.

The DPH Report recounts the incident based on DPH's investigation, and states that Jackson responded to the patient's request for aid, began incontinent care, and then left in the middle of that care, stating that she was on her break. DPH Report at 2. Jackson reported that the patient was "in a mess" to the registered nurse on duty, who then sent two other CNAs to care for the patient. *See id.* at 2–3. The DPH Report's factual recount of the incident concludes by noting that while Jackson did not provide the requisite care, other CNAs did so, and Fox Hill terminated Jackson. *See id.* at 3. The report then concludes that the facility, not Jackson, committed no violations or deficiencies. *See id.* at 4.

Instead of pursing her race and color-based discrimination claims, Jackson's discrimination argument focuses entirely on her Title VII and Connecticut statutory claims that Fox Hill retaliated against her for her March 2000 CHRO complaint, and her claim that Fox Hill subjected her to a hostile work environment. *See id.* at 6–15.

## B. Retaliation

Plaintiff's retaliation claim is examined applying the same *McDonnell Douglas* burden-shifting analysis used for discrimination claims. *See Terry,* 336 F.3d at 141. In order for Jackson to make her *prima facie* case for retaliation, she must show 1) that she engaged in a protected activity known to the defendant, 2) that she suffered an adverse employment action, and 3) a causal connection exists between the protected activity and the adverse employment action. *See id.* Once Jackson satisfies her *prima facie* burden, the burden of production shifts to Fox Hill.

Jackson argues that she has presented direct evidence of retaliatory animus. *See* Mem. Opp. Summ. J. at 10. Jackson argues that, after she filed her CHRO com-

plaint, Fox Hill's Administrator at the time, James Lopez, with full knowledge of the complaint, called her a "pain in the ass," stated that she caused a lot of problems, and indicated that he wanted to terminate her. *See id.* at 9. Jackson also alleges that Lopez, in conjunction with Jackson's supervisor and other nurses, attempted to solicit a false report from a pool aid nurse named Ella Huff in order to have an excuse to fire Jackson. *See id.* at 9–10. Finally, Jackson argues that if this direct proof of retaliatory animus is not sufficient, Fox Hill also began a pattern of disciplinary action against her immediately after she filed her CHRO complaint designed "to blemish Ms. Jackson's work record and for use at a later date when Ms. Jackson was terminated." *See id.* at 10.

Fox Hill argues that Jackson fails to make a *prima facie* showing on two prongs of the *Terry* test. *See* Mem. Supp. Summ. J. at 21. According to Fox Hill, Jackson fails to show that the Fox Hill officials who fired her in February 2001 knew about her CHRO complaint and fails to show a sufficient causal connection between her complaint and her termination. *See id.* Additionally, Fox Hill argues that part of Jackson's direct proof of a causal connection is not admissible evidence, but inadmissible hearsay. *See id.*

 Jackson's only evidence of the Ella Huff incident, one of two pieces of direct proof of a causal connection, is inadmissible hearsay. Jackson points to her deposition, Wright's deposition, Bonnie Slomcinsky's deposition, and an entry in Jackson's personnel file as evidence that officials at Fox Hill instructed Ella Huff to fabricate an affidavit concerning an incident between Jackson and Huff in order to have an excuse to fire Jackson. *See* Pl's Rule 56 at ¶ C.11. However, Wright testified that Huff told him that Fox Hill officials asked her to falsify a statement for them. *See, e.g.,* Wright Depo. at 10,

18, 24. This is inadmissible hearsay. Also inadmissible hearsay is Jackson's testimony that Wright told Jackson what Huff had told Wright. *See* Pl. Rule 56 at Ex. N, 98–102 ("Jackson Depo.") A close examination of Slomcinsky's deposition transcript at the section cited by Jackson reveals that at no time did Slomcinsky confirm Huff's story. *See* Pl's Rule 56 at Ex. P, 52–53 ("Slomcinsky Depo."). Finally, the note in Jackson's personnel file cited by Jackson states that Jackson was told that Ella was told to write a letter so that she could get "fired." *See* Pl's Rule 56 at Ex. K. This note is inadmissible hearsay as well, at least for the truth of the matter asserted: Huff's story. Thus, Jackson does not present any admissible evidence to the court concerning the Huff incident.

Jackson does have admissible evidence that James Lopez made statements that Jackson caused trouble, was a "pain in the ass", and needed to be fired. Wright testified that he heard Lopez make statements to this effect. *See* Wright Depo. at 30–32. Wright is a competent witness who can testify that Lopez, a party-opponent for the purposes of FED. R. EVID. 801(d)(2), made these statements. This is direct evidence that a Fox Hill administrator who was aware of Jackson's CHRO complaint held some form of animus towards her, potentially related to the CHRO complaint. *See* Pl's Rule 56 at Ex. D (Lopez's name appearing on letters concerning Jackson's CHRO complaint).

In the alternative, Jackson argues that a causal connection can be inferred from the fact that adverse employment actions occurred within a close temporal proximity to her filing of a CHRO complaint. *See id.* at 10. In the absence of direct proof of a causal connection between a plaintiff's protected activities and her termination, a plaintiff can show a causal connection by

showing that her termination occurred soon after the protected activity. *See Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996). In order to prove a causal connection in that manner, the temporal proximity must be "very close." *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citing cases holding that gaps between protected activity and adverse employment action as short as three or four months are insufficiently close to prove causation).

In the case at bar, Jackson filed her CHRO complaint in March 2000 and was fired in February 2001. This is a span of eleven months. Absent direct evidence of a causal connection, this is too great an amount of time to infer a sufficient causal connection for a rational jury to find for Jackson. *See Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir. 1990) (failing to find a causal connection where the time between the protected activity and the adverse employment action was three months); *see also Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 130 (2d Cir.1996) (finding no evidence of a causal connection where the protected action took place between one and three months before plaintiff was discharged); *Breeden*, 532 U.S. at 273–74, 121 S.Ct. 1508.

Jackson argues that Fox Hill engaged in a "continuing course of [adverse] conduct" following her March 2000 CHRO complaint leading to her termination, and that this is legally sufficient to show temporal proximity between her protected action and her termination. *See* Mem. Supp. Summ. J. at 10. She cites *Shaw v. Shell Oil Prods. Co.*, 119 F.Supp.2d 62, 68–69 (D.Conn.2000), to support this argument. However, *Shaw* does not stand for this proposition. In *Shaw*, the plaintiff had initially engaged in

protected activity in 1994 and was terminated in 1997. *See id.* at 68. However, the district court found that Shaw had engaged in a "continuum of [protected] activity" that lasted until six months before he was fired. *See id.* While the court did not rule on whether, by itself, six months constituted sufficient temporal proximity to find a causal connection,[4] it implied that the appropriate time to review was six months and not three years. *See id.* at 68–69. *Shaw* does not stand for the proposition that ongoing disciplinary actions by a defendant following a protected action are proof of a causal connection; it stands for the proposition that you start the clock on temporal proximity when the plaintiff undertakes his last protected activity. *See e.g., id.* Therefore, a space of eleven months between protected activity and termination is not close enough for a sufficient inference of causation.

Unlike the plaintiff in *Shaw*, Jackson does not have any additional evidence of a causal connection. As the court noted *supra*, Lopez's comments to Wright appear to offer some evidence of causation. However, there is an important fact Jackson appears to ignore: Lopez did not work at Fox Hill when Jackson was terminated. *See* Pl's Rule 56 at ¶A.70. He left Fox Hill's employ approximately three months before Jackson. *See id.* Even if Lopez did want to fire Jackson because of her CHRO complaint, he could not have done so. Moreover, Jackson has produced no evidence that any other employee responsible for her termination, administrator or otherwise, had knowledge of Jackson's CHRO complaint prior to her termination. *See, e.g., id.* at ¶¶A.44, A.54–57, C.2; *see also* Mem. Opp. Summ. J. at 9 (noting that Lopez knew of the CHRO complaint as

---

4. The court found additional evidence of a causal connection which, when examined in conjunction with the temporal proximity, constituted sufficient evidence to avoid summary judgment. *See id.* at 69.

evidence that Jackson had satisfied the first prong of the retaliation test). Therefore, Jackson has failed to proffer admissible evidence that the individuals at Fox Hill responsible for her termination were aware that she had filed a CHRO complaint, or that there was a causal connection between her filing of the CHRO complaint and her termination, sufficient for a reasonable jury to find in her favor. Fox Hill's motion for summary judgment on Jackson's retaliation claims is granted.

### C. Harassment/Hostile Work Environment [5]

In order to maintain a her claim of discriminatory harassment or a hostile work environment at Fox Hill, Jackson must show that the work environment at Fox Hill was both objectively and subjectively hostile towards her for a discriminatory reason. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). She must show the workplace was "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," to prove a Title VII violation. *Id.* at 21, 114 S.Ct. 367 (quotation omitted). The "mere utterance of an . . . epithet which engenders offensive feelings in an employee" is insufficient for such a showing. *See id.* (quotation omitted).

Whether a given work environment is objectively hostile can be determined by examining the totality of the circumstances, which may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance." *See id.* at 23, 114 S.Ct. 367. For hostility to be pervasive, incidents of harassment must be " 'more than merely episodic; they must be sufficiently continuous and concerted.' " *Hayut v. State Univ. of New York*, 352 F.3d 733, 745 (2d Cir.2003) (quoting *Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 577 (2d Cir.1989)). The standard for finding a hostile work environment is high, but not so high that an employer's actions must be "unendurable," "intolerable" or threaten the victim's "psychological well-being." *Terry*, 336 F.3d at 148.

Fox Hill argues, *inter alia*, that the facts Jackson relies on fail to meet this high standard. Fox Hill argues that being told to "mind [her] own business," allegedly being episodically wrongly disciplined, and allegedly being subject to efforts to make her resign does not qualify as being subject to acts sufficiently severe and pervasive to create a hostile work environment. *See* Mem. Supp. Summ. J. at 25. The court agrees.

Jackson fails to meet the high standard necessary to survive summary judgment on her harassment and hostile work environment claim. She points to little, if any, objective factual information in her Memorandum to lead the court to find that she suffered continuous discrimination at Fox Hill of a severe and pervasive nature. Jackson's Memorandum sets out the legal standard, and then relies on case law that supports the concept that the objective component of a hostile work environment claim is to be left "to the sound discretion of reasonable jurors." Mem. Opp. Summ. J. at 14. Instead of pointing to the material facts she must be able to present in

---

**5.** The necessary showing to maintain either a harassment or hostile work environment claim are functionally identical. *See Hayut v. State Univ. of New York*, 352 F.3d 733, 745 (2d Cir.2003) (noting that sexual harassment and hostile work environment claims are considered using the same theory and jurisprudence).

order to get her case to those jurors, Jackson merely repeats her allegations that "[a]dministrators, nurses, directors of nursing, and supervisors wanted Jackson terminated," and "[a]dministrators, nurses, directors of nursing, and supervisors continually harassed the plaintiff during her employment with the defendant." *See id.* In fact, Jackson does not even allege that this discrimination is based on race, color, or retaliation for her CHRO complaint. Plaintiff has clearly failed to meet her burden to show that there are material facts in dispute on this claim.

That being said, the court will take a brief moment to address factual allegations that appear in the record, if not in Jackson's legal memorandum, that might support her allegations. In her Rule 56 responses, Jackson admitted that she intends to base her harassment and hostile work environment claim on people telling her to "mind her own business" when she attempted to complain about the care other employees gave to patients, the alleged wrongful discipline by Fox Hil and upon "a concerted effort to have her resign." *See* Pl's Rule 56 at ¶¶ A.47–48. Additionally, Wright's testimony that fellow employees made fun of her by calling her "monkey" and laughing at her wig might be argued to create hostility. *See* Wright Depo. at 28.

While wrongful discipline, attempted censorship, and offensive name-calling might rightfully offend the average person, it hardly amounts, over a period of thirteen months, to the type of "discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." *Harris,* 510 U.S. at 21, 114 S.Ct. 367. The record does not show that the actions Jackson complains of were frequent, severe, or physically threatening or humiliating. Therefore, under the totality of the circumstances, Jackson has failed to prove her work environment was objectively hostile, and her claim fails. Fox Hill's motion for summary judgment on Jackson's harassment and hostile work environment claim is granted.

## D. Emotional Distress

Counts Three and Four of Jackson's Second Amended Complaint allege negligent and intentional infliction of emotional distress.

### 1. *Negligent Infliction of Emotional Distress*

In order to maintain a claim for negligent infliction of emotional distress under Connecticut law, Jackson must show that Fox Hill " 'should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm.' " *Barrett v. Danbury Hosp.,* 232 Conn. 242, 260, 654 A.2d 748 (1995) (quoting *Montinieri v. Southern New England Tel. Co.,* 175 Conn. 337, 345, 398 A.2d 1180 (1978)). However, under Connecticut law, a defendant may not be held liable for negligent infliction of emotional distress for conduct occurring as part of an ongoing employment relationship. *See Perodeau v. City of Hartford,* 259 Conn. 729, 762–63, 792 A.2d 752 (2002). In order to state a claim for negligent infliction of emotional distress in the employment context, the employee must have been terminated. *See, e.g., id.* at 750, 792 A.2d 752. But "[t]he mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially acceptable behavior." *See id.*

Fox Hill argues that the circumstances surrounding Jackson's termination, even if wrongful, were not egregious enough to transgress the bounds of socially acceptable behavior. *See* Mem. Supp.

Summ. J. at 33. Fox Hill argues that it received a complaint for patient neglect, investigated that complaint, suspended Jackson, made the appropriate filings with the police and state agencies, and eventually terminated her when it concluded she had neglected a patient. *See id.* These actions, Fox Hill contends, were not unreasonable.

Jackson does not address her negligent infliction of emotional distress claim in her memorandum in opposition. She has failed to meet her burden under FED. R. CIV. P. 56 to show a material issue of fact exists on this claim. Nothing before the court supports the common law definition of negligent infliction of emotional distress. Therefore, Fox Hill's motion for summary judgment on Jackson's claim for negligent infliction of emotional distress is granted.

### 2. *Intentional Infliction of Emotional Distress*

■ In order to maintain her claim for intentional infliction of emotional distress under Connecticut law, Jackson must show that 1) Fox Hill intended to inflict emotional distress on her or knew, or should have known, that emotional distress was the likely result of its actions; 2) that Fox Hill's conduct was extreme and outrageous; 3) that Fox Hill's conduct is the cause of Jackson's emotional distress; and 4) that the emotional distress sustained is severe. *See Appleton v. Bd. of Educ. of the Town of Stonington,* 254 Conn. 205, 210, 757 A.2d 1059 (2000). Whether Fox Hill's conduct was extreme and outrageous is the initial question for the court to address. *See id.* "Only where reasonable minds disagree does it become an issue for the jury." *Id.*

To be extreme and outrageous, Fox Hill's conduct must exceed "all bounds usually tolerated by decent society . . . ." *See id.* (quotation omitted). In fact,

[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d, 73 (1965)).

■ Fox Hill asserts that reasonable minds cannot disagree in this situation. *See* Mem. Supp. Summ. J. at 35. Fox Hill argues that even if the court takes the facts as Jackson alleges—that she was falsely accused of patient abuse twice, falsely disciplined, disciplined for behavior that others were not disciplined for, the subject of a campaign to terminate her or make her resign, and the subject of offensive remarks—Fox Hill's conduct does not meet the definition of extreme and outrageous. *See id.* According to Fox Hill, no reasonable member of society would find these allegations to be " 'beyond all possible bounds of decency,' 'atrocious,' and 'utterly intolerable in a civilized community.' " *Id.*

Jackson relies on *Caesar v. Hartford Hosp.* for the proposition that Fox Hill's actions amount to extreme and outrageous conduct. *See* 46 F.Supp.2d 174 (D.Conn. 1999). Jackson asserts that the conduct that the *Caesar* district court found sufficient to maintain a claim for intentional infliction of emotional distress—namely filing false charges of patient abuse with a state agency; discrimination based on race, color, national origin, and age; and retaliation—is substantially similar to the conduct in the case at bar. *See* Mem. Opp. Summ. J. at 19–20. Therefore, Jackson argues, the court should find that Fox

Hill's actions were extreme and outrageous. *See id.* at 20.

The court does not find that Fox Hill's conduct in this case, even when viewed in a manner most favorable to Jackson, rises to the level of extreme and outrageous. While its actions might be offensive, insulting, and hurtful, *see Appleton*, 254 Conn. at 211, 757 A.2d 1059, no reasonable member of the community could view them as "atrocious, and utterly intolerable in a civilized community," *id.* *Caesar* does not compel a different finding.

In *Caesar*, the district court examined the plaintiff's allegations pursuant to a motion to dismiss. *See* 46 F.Supp.2d at 176. Applying the lower standard of evidentiary sufficiency applied to such a motion, the court found that Caesar had stated a claim for intentional infliction of emotional distress. *See id.* at 180. The court based its finding on Caesar's allegations of discrimination and her allegation that Hartford Hospital had provided false information to a state regulatory agency for a malicious purpose and without having investigated the situation. *See id.* at 179.

In the case at bar, the court has already granted summary judgment to Fox Hill on all of Jackson's discrimination claims. Additionally, Jackson admits that Fox Hill investigated the charges against Jackson in both the January 2000 and February 2001 incidents, and makes no claim that Fox Hill undertook its state filings with malicious intent. *See* Pl's Rule 56 at ¶¶ A.21, A.35. Also, Jackson admits that Fox Hill cleared her of any wrongdoing with regards to the January 2000 incident. *See id.* at ¶ A.40.

While Caesar needed only to allege sufficient facts to avoid dismissal, Jackson must provide the court with sufficient admissible evidence to create an issue of material fact. Jackson has not done so. Therefore, Jackson has not made a sufficient showing to avoid summary judgment on her claim of intentional infliction of emotional distress. Fox Hill's motion for summary judgment on Jackson's claim of intentional infliction of emotional distress is granted.

### E. Public Policy

Count Two of Jackson's Second Amended Complaint appears to attempt to state a claim that Fox Hill's firing of Jackson was wrongful as against public policy. Fox Hill argues that under Connecticut common law, Jackson "must show that no state statutory remedy was available, and that the only avenue to redress Fox Hill's alleged misconduct in violation of a valuable social policy was to file a common law claim." Mem. Supp. Summ. J. at 30; *see Atkins v. Bridgeport Hydraulic Co.*, 5 Conn.App. 643, 501 A.2d 1223, 1226 (1985). Fox Hill argues that Jackson has failed to allege any statutory, constitutionally, or judicially recognized public policy that Fox Hill's actions contravened, and that any claims of discriminatory or wrongful termination are actionable under Title VII, Section 1981, CONN. GEN. STAT. §§ 46a–58(a), 46a–60(a)(1)—(a)(4), and several other Connecticut statutes. *See* Mem. Supp. Summ. J. at 29–31.

Jackson makes no argument concerning public policy, or any other argument on any theory, in her Memorandum in Opposition to Summary Judgment that can confidently be attributed to Count Two. It appears Jackson has abandoned it. In any event, Jackson has not raised any discernable issues of material fact as to Count Two. Fox Hill's Motion for Summary Judgment as to Count Two is granted.

### III. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment [Dkt. No.

34] is **GRANTED** as to all counts. The clerk is ordered to close the case.

**SO ORDERED.**