James K. SHAW

v.

SHELL OIL PRODUCTS CO.

No. 3:98CV2170 (JBA).

United States District Court, D. Connecticut.

June 2, 2000.

John C. Fusco, Holland Kaufmann & Bartels, Greenwich, CT, for James K. Shaw, plaintiffs.

L. Chris Butler, Shell Oil Company, Houston, TX, Gerald P. Dwyer, New Haven, CT, for Shell Oil Prod. Co., defendants.

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. # 23]

ARTERTON, District Judge.

Plaintiff James Shaw (Shaw) claims that the defendant Shell Oil Products Company (Shell) terminated him in retaliation for his earlier role in the investigation of a claim of hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a) and Conn. Gen. Stat. § 46a–60(a)(4) and (5). Shaw also alleges that the circumstances of his termination of employment constituted intentional infliction of emotional distress, negligent infliction of emotional distress, and tortious breach of contract. Shell asserts that there is no evidence that Mr. Shaw's role in the investigation of sexual harassment of another employee played any role in its decision to terminate him, and that he was terminated due to his demeaning, racist remarks about two employees in violation of Shell's Equal Opportunity Policy. The Court heard oral argument on Defendant's Motion for Summary Judgment directed at all counts on May 24, 2000.

For the reasons that follow, defendant's motion is DENIED in part and GRANTED in part.

### I.  FACTUAL BACKGROUND

The facts of this case, taken in the light most favorable to Mr. Shaw as the party against whom summary judgment is proposed, are as follows. Mr. Shaw started his employment with Shell on March 1, 1972 as a Plant Operator at Shell's Bridgeport Distribution Plant. See Shaw Dep. at 5. On March 21, 1994, Mr. Shaw was promoted to Lead Operator, the position he held until his termination on June 8, 1997. See Shaw Dep. at 6. As Lead Operator, Mr. Shaw continued to perform his Plant Operator responsibilities as well as additional responsibilities including taking in ships, completing paperwork, maintaining files and interfacing with contractors. See Shaw Dep. at 12. During 1994, Sandra Newtown came to the Bridgeport Distribution Plant as the Facility Supervisor overseeing the delivery of trucks. See Shaw Dep. at 28. Mr. Shaw heard Ken Johnson, the Facility Supervisor, call Ms. Newtown a "cunt" while he and another worker (Rick Voyteck) were standing on the loading platform in front of the warehouse. See Shaw Dep. at 30. Mr. Shaw reported the remark to Ms. Newtown and recommended that Ms. Newtown speak to Glen Fillion, the Plant Manager and commented to Mr. Voyteck that he did not think Mr. Johnson's comment was appropriate. See Shaw Dep. at 31–33.

In March 1995, Shell sent Deirdre Chestang, a Human Resources Representative from Houston to investigate the allegations made by Ms. Newtown. See Shaw Dep. at 34. In response to Ms. Chestang's questions, Mr. Shaw reported the incident with Johnson and Ms. Newtown's later reference to Mr. Johnson as "Richard cranium" by which she said she meant "dick head."

*See* Shaw Dep. at 35. After Ms. Chestang completed her fact finding, Mr. Shaw spoke to Mr. Johnson about what he had told Ms. Chestang. *See* Shaw Dep. at 38. He also discussed it with Mr. Voyteck. *See* Shaw Dep. at 37. During the spring of 1995, Mr. Shaw met with Jim Munson, Shell's Area Business Manager and Jim Williams, Shell's Human Resources Representative, and discussed with them what he had reported to Ms. Chestang. During this first meeting, either Munson or Williams indicated that "it would be easier if you had not heard it" or words to that effect. *See* Shaw Dep. at 39. Mr. Shaw met with Mr. Williams and Mr. Munson on at least one other occasion where they again indicated "if you didn't hear it, it makes it easier." *See* Shaw Dep. at 40. Although Mr. Shaw testified that they did not actually ask him to change his testimony, he interpreted their questions as such and at one point said to Mr. Munson, "[i]f you want to ask me any more questions, it would have to be through a lawyer." *See* Shaw Dep. at 39. On March 29, 1995, Mr. Munson and Mr. Williams met with Ms. Newtown to inform her that as a result of the investigation, there was no basis for her complaint. *See Newtown v. Shell Oil Co.,* 52 F.Supp.2d 366 (D.Conn.1999) (Goettel, J.) (ruling on summary judgment). In July 1995, Mr. Johnson retired from Shell as the Plant Superintendent. *See* Shaw Dep. at 41. Chris Arosell replaced him as Plant Superintendent and Ms. Newtown continued as Plant Supervisor. *See* Shaw Dep. at 42. On September 27, 1995, Ms. Newtown was terminated from Shell. *See* Shaw Dep. at 49. Mark Scully replaced Ms. Newtown. *See* Shaw Dep. at 49.

After being terminated, Ms. Newtown filed her complaint with the CHRO and the EEOC alleging sexual discrimination and sexual harassment. On October 29, and November 29, 1996, the CHRO issued to Ms. Newtown its letter releasing jurisdiction over her complaint. On January 27, 1997, Ms. Newtown filed her federal complaint against Shell, Mr. Williams and Mr. Munson. *See Newtown,* 52 F.Supp.2d at 370.

In November 1996, Rebecca Lunstroth replaced Mr. Fillion as Plant Manager. *See* Shaw Dep. at 50. Both before and after this appointment, Ms. Lunstroth worked in various human resources capacities, previously as manager at Shell's Carson Plant and subsequently, as manager of human resources for another Shell company, Equiva Trading Company. *See* Lunstroth Dep. at 8. Ms. Lunstroth testified that such a move from human resources to plant management was not the norm, but nonetheless not unheard of and that she welcomed the challenge when approached by senior management. *See* Lunstroth Dep. at 14. Upon her arrival in Bridgeport, a tense relationship developed between her and Mr. Shaw. In the spring of 1997, Ms. Lunstroth first approached Shaw about his performance and her issues with his role, including his overtime and his perception of his responsibilities as Lead Plant Operator. *See* Shaw Dep. 51–52. Ms. Lunstroth was of the view that Mr. Shaw might not have liked "a chick coming in without experience questioning what the hell he was doing and hated" her for that. *See* Lunstroth Dep. at 77.

At some point in either May or June 1997, Ms. Lunstroth received a written complaint about Mr. Shaw delivered by two of the Operators. *See* Lunstroth Dep. at 54. Although the record does not establish who wrote the letter, *see* Whipple Dep. at 15, John Cummings and Rick Voyteck (the other witness to Mr. Johnson's 1994 uncouth comment about Ms. Newtown) handed the formal complaint to Ms. Lunstroth. *See* Lunstroth Dep. at 55. In the two page letter, unnamed operators complained about Mr. Shaw's view of his position as lead operator, view of himself as full supervisor, the manner of his direction and manipulation of them, and his use of inappropriate and derogatory language about co-workers. *See* Lunstroth Dep. Ex. 3. A portion of the letter stated:

There is one last issue that concerns the Operators greatly. With all of the recent problems at other major companies, we also have great concern with Jim's inappropriate and derogatory language and or descriptions of co-workers while talking about and to fellow employees. *See* Lunstroth Dep. Ex. 3.

Upon receipt of the anonymous letter ostensibly written on behalf of the operators, Ms. Lunstroth discussed it with Mr. Williams. *See* Lunstroth Dep. at 57. Ms. Lunstroth spoke to each of the operators who informed her that some of the referenced derogatory comments were about her. *See* Lunstroth Dep. at 74. Initially, Ms. Lunstroth thought the operators might be attempting retribution at Mr. Shaw, but later decided that she believed them. Ms. Lunstroth observed that the operators' stories were "frighteningly similar," and she reported that operator Ricky Shaw cried when telling her the nature of the comments. *See* Lunstroth Dep. at 75–76.

While Ms. Lunstroth was aware of Newtown's case, she denies ever discussing it with anyone. *See* Lunstroth Dep. at 52. Though there were documents at the Bridgeport plant regarding Ms. Newtown's case, she claims to have never reviewed any of them. *See* Lunstroth Dep. at 53.

It is undisputed that Shaw was aware of Shell's Equal Opportunity Policy. *See* Shaw Dep. Ex. B and D. ("It is the policy of Shell Oil Company to provide equal opportunity to all persons . . . ."). Plaintiff does not dispute that the statements attributed to him, if made, would violate Shell's policy.

Although Mr. Shaw concedes he knew Ms. Lunstroth was Jewish, he denies making any of the comments attributed to him by the other operators. On June 21, 1997, Mr. Shaw was suspended from his job. *See* Shaw Dep. at 60. He was told by Ms. Lunstroth that he was being suspended due to his derogatory comments regarding her Jewish ancestry and about Mr. Mitch-

ell's African American ancestry. *See* Shaw Dep. at 60. At some point after discussing the anonymous complaint letter further with Ms. Lunstroth and Mr. Bailey, Mr. Williams called Mr. Whipple, in Shell's human resources office in Houston, informed him of the allegations and requested that he come to conduct an investigation since Mr. Williams claimed he was too busy. *See* Whipple Dep. at 10, 12. On July 1, 1997, Mr. Whipple came to the Bridgeport Plant and interviewed each of the operators (Rick Shaw, Rick Voyteck, Dominique Patrissi, Dan Yeager, Mike Mitchell, John Cummings, Mark Scully) and compiled a report from his notes of their allegations, and Mr. Shaw's response. *See* Whipple Dep. at 17, 18. Mr. Whipple did not retain these notes and, as clarified at oral argument, his report was only disclosed to Mr. Shaw as part of the subsequent CHRO investigation. The report alleges that Mr. Shaw made several truly despicable comments with respect to Ms. Lunstroth's Jewish heritage ("she is one the ovens missed," "he had worked for Jews before and you don't want to work for one," "the Nazis must be running the electric plant and throwing more Jews in the fire," "a woman should not be plant manager" "Kike Jew Bastard," "Hitler should have wiped out all the Jews," Hitler must have missed one of the Jews," "Jew bitch" and other comments to the effect that Ms. Lunstroth and her children should be thrown into the oven), as well as racist comments about an African–American operator (Mike Marshall) ("another OJ [Simpson]" "nigger" and that he should never have been hired). *See* Whipple Dep. Ex. 5. In his written report, Mr. Whipple simply recounts the allegations without evaluation of credibility. In deposition, Mr. Whipple stated that he believed the allegations because, in contrast to Ms. Lunstroth's observation that they were "frighteningly similar," he found the comments were different enough, and the operators showed emotion in regard to some of the comments, and he had found no evidence they were making it up or con-

spiring. He conveyed his conclusions to Mr. Williams and to Ms. Lunstroth, *see* Whipple Dep. at 19, 26, but testified that he reported back to Mr. Williams for the most part. *See* Whipple Dep. at 27. On July 8, 1997, Mr. Shaw was informed by Mr. Bailey, the District Manager, that his employment was terminated based on his remarks. *See* Shaw Dep. at 62. Mr. Voyteck assumed Mr. Shaw's responsibilities as Lead Operator. *See* Lunstroth Dep. at 94, 98 and 99. During all these events, Ms. Newtown's lawsuit against Shell, Williams and Munson was pending in federal court.

## II. STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law." As a "general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *See Tomka v. Seiler,* 66 F.3d 1295, 1304 (2d Cir.1995). If, when viewing the evidence produced in the light most favorable to the non-movant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991).

In cases alleging employment discrimination, the Second Circuit has held that additional considerations must be taken into account when deciding whether summary judgment should be granted. *See Gallo v. Prudential Residential Services,* 22 F.3d 1219, 1224 (2d Cir.1994). In such cases, the trial court must be particularly cautious about granting summary judg-

ment when the employer's intent is at issue, and affidavits and depositions must be scrutinized for circumstantial evidence that, if believed, would support the plaintiff's claim. *Id.* at 1224. Though caution must be exercised in granting summary judgment where intent is genuinely in issue, summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact. *See e.g., Woroski v. Nashua Corp.,* 31 F.3d 105, 110 (2d Cir.1994).

## III. DISCUSSION

### A. Retaliation Claims under Title VII and Conn. Gen.Stat. § 46a–60(a)(4)(5)(Counts One and Two)

■ The retaliation claims asserted under Title VII and Conn. Gen.Stat. § 46a–60,[1] are governed by the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. In order to establish a prima facie case of retaliation, plaintiff must demonstrate that: (1) he was engaged in protected activity; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer. *See Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir.1993).

Shell does not dispute plaintiff's satisfaction of the first three elements of his prima facie case, but targets the fourth element, claiming "there is no evidence to support a finding of causal connection between Shaw's reporting of a crude comment by a supervisor in the Fall of 1994, the investigation of that comment in the Spring of 1995, and the termination of Shaw's employment in July 1997." *See*

---

1. *See Newtown v. Shell Oil Co.,* 52 F.Supp.2d 366, 374 (applying same analysis to retaliation claim brought under state and federal statutes observing that "Connecticut courts

have looked to federal precedent in the employment discrimination arena for guidance in enforcing the state antidiscrimination statutes").

Def.'s Mem. of Law in Support of Motion for Summary Judgment at 5.

A causal connection between protected activity and an adverse employment action can be established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment or through evidence of disparate treatment of employees who engaged in similar conduct or directly through evidence of retaliatory animus. *See Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.1991); *DeCintio v. Westchester County Medical Center*, 821 F.2d 111, 115 (2d Cir.1987).

Defendant is correct that Mr. Shaw fails to show any direct evidence demonstrating a nexus between Ms. Lunstroth's treatment of him and his protected activity. Although Ms. Lunstroth was aware of Ms. Newtown's case and acknowledged there were files related to the case in the Bridgeport office, there is no evidence that Ms. Lunstroth had any knowledge of Mr. Shaw's protected activity. Shell also correctly notes that the record is devoid of any evidence that Mr. Whipple or Mr. Bailey had any knowledge of Mr. Shaw's protected activity, and neither of them was working at the Bridgeport plant in 1994. Therefore, defendant argues that protected activity in 1994 provides no inference of defendant's retaliatory motive in 1997, and that its articulated legitimate nondiscriminatory reason for Mr. Shaw's termination is unrebutted and therefore summary judgment should enter.

In fact, all plaintiff submits in opposition is his affidavit and his performance evaluations, which demonstrate his long employment and consistently superior performance evaluations, Shell's corporate sex discrimination and antiretaliatory policy, his protected activity in 1994, Shell's investigation of Ms. Newtown's complaint and his allegations that Shell pressured him to alter his testimony, Ms. Lunstroth's ill treatment and criticism of him, the circumstances of his suspension and termination, his denial of having made the offensive remarks about Ms. Lunstroth attributed to him and his opinion that he was retaliatorily terminated. Plaintiff's conclusory opinion of why he was terminated is not relevant, *see Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996), nor is Mr. Shaw's denial of defendant's allegations of his misconduct sufficient to create an issue of material fact. *See Kilroy v. Mount St. Mary College*, 152 F.3d 918 (2d Cir.1998). At oral argument, plaintiff argued that an adequate factual rebuttal showing pretext was demonstrated by Ms. Lunstroth's failure to check his past performance record or interview past supervisors before terminating him, as such efforts would have shown his excellent record, the absence of any discipline, and his previously successful working relationship with a woman supervisor (Newtown). The Court disagrees that this alone is adequate to withstand defendant's motion for summary judgment.

Nonetheless, "since it is rare indeed to find in an employer's records proof that a personnel decision was made for a discriminatory reason, whatever other relevant depositions, affidavits and materials are before the district court must be carefully scrutinized for circumstantial evidence that could support an inference of discrimination." *Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81 (2d Cir. 1996). Notwithstanding the sparse record offered by plaintiff and the above-identified shortcomings in plaintiff's arguments in opposition, defendant overstates its position when it characterizes the record as completely lacking any evidence from which nexus could be inferred. First, the circumstances to be considered for retaliatory motive do not implicate only protected activity in 1994 and adverse employment action in 1997. There has been a continuum of activity on Ms. Newtown's case in which Mr. Shaw was likely to be a substantial witness against Shell. In 1995, there was an internal Shell investigation; in 1996 there was a CHRO investigation, in 1997, federal litigation commenced. Six months later, Mr. Shaw was fired. It is

unnecessary here to determine whether this sequence alone could create sufficient inference of unlawful motivation to warrant a jury trial, *see Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998) (reversing summary judgment on retaliation claim where plaintiff was terminated less than two months after filing a complaint) *with Suggs v. Port Auth.*, No. 97 Civ. 4026, 1999 WL 269905, at *6 (S.D.N.Y. May 4, 1999) (causal connection established where plaintiff was terminated six months after filing a complaint), because there is additional evidence related to Mr. Williams, the plant human resources representative. Mr. Williams undisputedly knew of plaintiff's protected activity, as well as the significant impact of Mr. Shaw's testimony, having been present at two meetings related to the Newtown investigation in which Mr. Shaw claims he was told that it would be best if he forgot what he claimed to remember. Mr. Williams was individually named as a defendant in Ms. Newtown's discrimination and retaliation complaint during this time period, and he was involved in the investigation and termination of Mr. Shaw, consulting with both Mr. Whipple and Ms. Lunstroth throughout. From these circumstances, reasonable jurors could infer that Williams had a retaliatory motive to develop a basis for discrediting Mr. Shaw as a witness in the Newtown case and that motive tainted or infected the investigation and termination process. Even if Shell reasonably believed that in some form or manner, Mr. Shaw had made derogatory comments about Ms. Lunstroth, considering his impeccable record during his long employment history and, ironically, his demonstrated commitment to eliminating workplace discrimination, it could have imposed a punishment less severe than the ultimate workplace sanction of termination. Whether the claimed shortcomings in Mr. Whipple's and Ms. Lunstroth's investigation or Shell's ultimate decision to terminate Mr. Shaw were motivated at least in part by a retaliatory bias that could be attributed to Mr. Williams remains a matter for the credibility determinations and reasonable inferences of the factfinder.

Therefore, Defendant's Motion for Summary Judgment is DENIED as to Counts One and Two.

## B. Intentional Infliction of Emotional Distress (Count Three)

■ Shell claims that there is no evidence that its conduct was so extreme and outrageous as to sustain a claim for intentional infliction of emotional distress under Connecticut law. To prevail on a claim for intentional infliction of emotional distress, the plaintiff must prove: 1) that the actor intended to inflict emotional distress; or knew or should have known that emotional distress was the likely result of its conduct; 2) that the conduct was extreme and outrageous; 3) that the defendant's conduct was the cause of the plaintiff's distress; and 4) that the emotional distress sustained by the plaintiff was severe. *See Petyan v. Ellis*, 200 Conn. 243, 253, 510 A.2d 1337 (1986). Ordinarily, the disputed conduct must exceed all bounds tolerated by decent society, and cannot be merely rude, tactless or insulting. *See Petyan*, 200 Conn. at 254, 510 A.2d 1337 (1986). "[A] line can be drawn between the slight hurts which are the price of a complex society and the severe mental disturbances inflicted by intentional actions wholly lacking in social utility." *Whelan v. Whelan*, 41 Conn.Supp. 519, 522, 588 A.2d 251 (1991).

■ The threshold issue is whether plaintiff has alleged extreme and outrageous conduct by the defendant. Here, Mr. Shaw concedes "[i]t was not the fact that Mr. Shaw was terminated, that caused his distress, it was the improper allegations of Mr. Shaw's manipulative actions and verbal impropriety that Shell used to support its termination decision, that meets the standards of intentional infliction of emotional distress." *See* Pl.'s Mem. at 8. As clarified at oral argument, Mr.

Shaw did not learn the specifics of the allegations made against him until well after he was terminated. Therefore, while falsely or recklessly accusing a person of the particular horrendous comments in dispute here might under different circumstances be conduct rising to the requisite level of extreme and outrageous, Mr. Shaw does not allege that Shell manufactured or encouraged the operators to make such allegations, but only challenges how Shell investigated them and made the decision to terminate him. Any of the procedural or substantive deficits in Shell's investigation, suspension or termination process which could be found to constitute extreme and outrageous conduct.

Therefore, Defendant's Motion for Summary Judgment is GRANTED as to Count Three.

## C. Negligent Infliction of Emotional Distress (Count Four)

■■■■ Shell also moves for summary judgment on Count Four, negligent infliction of emotional distress, on the grounds that there is no evidence of any "extreme and outrageous behavior." To prove this tort, the plaintiff must demonstrate "that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm ... [N]egligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct of the defendant in the termination process ... The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress." *Parsons v. United Technologies Corp.*, 243 Conn. 66, 88–89, 700 A.2d 655 (1997) (citations omitted). In opposing summary judgment, Shaw contends that Ms. Lunstroth's treatment of him upon her arrival, namely demoting him and eventually terminating him with little or no investigation, serves as the basis of this claim. However, "[t]he mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior." *Parsons*, 243 Conn. at 89, 700 A.2d 655. The Court finds that neither Ms. Lunstroth's mistreatment of plaintiff nor plaintiff's evidence of shortcomings in defendant's investigation, suspension and termination process could suffice as proof of negligent infliction of emotional distress. *See Malik v. Carrier Corp.*, 202 F.3d 97, 108 (2d. Cir.2000) (rejecting alleged sexual harasser's claim for negligent infliction of emotional distress "[b]ecause the events upon which his claim rests are common to investigations into sexual harassment under federal law, we need not describe with precision the kind of egregious or outrageous act that might legitimately support a claim in such circumstances."). Under the circumstances, Mr. Shaw fails to identify how Shell's handling of its investigation and sequelae resulting in termination could constitute either egregious or outrageous conduct.

Accordingly, Defendant's Motion for Summary Judgment is GRANTED as to Count Four.

## D. Tortious Breach Contract (Count Five)

Shell also moves for summary judgment on Shaw's Fifth Count alleging tortious breach of contract on the grounds that it is preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) (LMRA) and/or Connecticut law does not recognize a cause of action for tortious breach of contract.

■■■■ Since Count Five, expressly pled as based on violations of the collective bargaining agreement (CBA), *see* Compl. ¶ 34, is inextricably intertwined with and involves interpretation of the CBA, and therefore, is necessarily preempted by the LMRA. *See Allis–Chalmers v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). Moreover, even if not otherwise preempted by the LMRA, the viability of a

claim for tortious breach of contract under Connecticut law is doubtful. *See Newtown v. Shell Oil Co.*, 52 F.Supp.2d 366, 376 (D.Conn.1999).

Therefore, Defendant's Motion for Summary Judgment as to Count Five is GRANTED.

### Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. # 23] as to Counts One and Two is DENIED and GRANTED as to Counts Three, Four and Five.

IT IS SO ORDERED.