Carolyn LONGSHORE–
PIZER, Plaintiff,

v.

State of CONNECTICUT, Department of Mental Health and Addiction Services, Capitol Region Mental Health Center, Laurel Reagan, Carl Shields, Ray Cioffi, and James Ransom Reed, Jr.. Defendants.

No. 3:04–CV–1601(JCH).

United States District Court,
D. Connecticut.

Sept. 12, 2006.

Cynthia Renee Jennings, The Barrister Law Group, Bridgeport, CT, for Plaintiff.

Joseph A. Jordano, Attorney General's Office, Hartford, CT, for Defendants.

## RULING RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### [Doc. No. 44]

HALL, District Judge.

The plaintiff, Carolyn Longshore–Pizer, brings this action against the defendants, the State of Connecticut Department of Mental Health and Addiction Services— Capital Region Mental Health Center ("CRMHC"). In her Complaint [Doc. No. 1], Longshore–Pizer alleges race discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.*.

The defendants have filed a Motion for Summary Judgment [Doc. No. 44] pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, the defendants' motion is GRANTED.

## I. STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgement as a matter of law. *Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *White v. ABCO Engineering Corp.,* 221 F.3d 293, 300 (2d Cir.2000). Once the moving party has met its burden, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial," *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505, and present such evidence as would allow a jury to find in his favor in order to defeat the motion. *Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgement is sought. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Graham,* 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 134 (2d Cir.2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. *Sologub v. City of New York,* 202 F.3d 175, 178 (2d Cir.2000).

## II.  FACTS [1]

Longshore–Pizer is a black female who is a resident of Connecticut and, at all times relevant to her complaint, was an Office Supervisor for the CRMHC. Longshore–Pizer's position as an Office Supervisor was covered by a union contract for administrative clerical employees. The State of Connecticut Department of Mental Health and Addiction Services ("DMHAS") is a state agency that employs over fifteen employees. The CRMHC is a subdivision of the DMHAS. Prior to September 2003, Regan was the Division Director for Acute Services. After a CRMHC reorganization in September 2003, Reagan became the Chief of Operations for Clinical Services at CRMHC. Shields, at all times relevant to this complaint, was the Managing Director of Recovery Services and Community Integration at CRMHC. Cioffi is currently the Director of Labor Relations at DMHAS, a position he has held since December 2004. Before 2004, and for all times relevant here, Cioffi was the Director of Personnel for CRMHC. Reed was an Affirmative Action Officer assigned to Cedarcrest Regional Hospital/Blue Hill Substance Abuse Center and to the CRMHC. In his duties as the Affirmative Action Officer, Reed investigated claims of discrimination filed by DMHAS employees.

At the time this action commenced, Longshore–Pizer had been a DMHAS employee since 1982.[2] Sometime prior to 2000, Longshore–Pizer became the acting Officer Supervisor in the New Haven office of the CRMHC. There, her duties included managing staff coverage, signing payroll, and attending meetings related to the DMHAS Mental Health Center in New Haven. In 2000, Longshore–Pizer's position was elevated to permanent officer supervisor. This new job classification resulted from the settlement of a complaint of discrimination that Longshore–Pizer filed in 1999 with the Connecticut Commission on Human Rights ("CHRO").

Around December 19, 2002, Longshore–Pizer received a layoff notice at the

---

1.  For the purposes of the instant motion, the court accepts as true facts undisputed by the parties and resolves disputed facts in favor of Longshore–Pizer where she provides evidence to support her allegations.

2.  Longshore–Pizer's current employment status with the DMHAS is unclear, but nothing in the record suggests that it is relevant to the current discussion.

CRMHC–New Haven. The layoff notice came on the heels of state-wide layoffs at CRMHC and other DMHAS facilities. In addition, Longshore–Pizer received the layoff notice two days after she filed a separate complaint of discrimination with the CHRO on December 17, 2002. Despite this, the parties agree that the layoffs were based on a collective bargaining agreement that determined job classifications and layoffs based on seniority. Thus, there is no dispute that the Longshore–Pizer received her December 2002 layoff notice because of her seniority as a clerical office supervisor.

Pursuant to DMHAS's collective bargaining agreement with the union, Longshore Pizer exercised her right to laterally "bump" another DMHAS office manager with less seniority. As a result of her decision, Longshore–Pizer transferred to the CRMHC office in Hartford on January 13, 2003. The person whom Longshore–Pizer "bumped" in coming to CRMHC–Hartford was Colleen Mercier. Mercier was subsequently demoted to the position of office assistant at CRMHC–Hartford. Prior to her demotion, Mercier's office manager position at CRMHC–Hartford was subject to little or no direct supervision. Her main duties included personally handling the administrative tasks necessary to provide services to DMHAS clients. As staffing levels decreased, her clerical duties increased.

There is no dispute that Longshore–Pizer's employment responsibilities changed when she became CRMHC–Hartford's office manager. For example, while Longshore–Pizer supervised somewhere between two to five clerical staff employees between 2000 and late 2002 at CRMHC–New Haven, she had no employees to supervise at CRMHC–Hartford until June 2003. Instead, Longshore–Pizer's primary responsibilities in Hartford involved providing administrative/clerical support for Reagan's Acute Services division and Shields' Special Services division ("SSD"). There were no clerical support employees in either of these departments when Longshore–Pizer began work in Hartford, leaving her the only clerical employee available for the two departments. Thus, Longshore–Pizer's assignments at CRMHC–Hartford included taking minutes at medical staff meetings, preparing time sheets, processing the monthly pharmacy report, reporting mileage, handling travel authorizations/reimbursements, ordering supplies, processing work orders and performing minimal typing.

On October 3, 2003, Reagan and Shields issued an annual review of Longshore–Pizer's performance for the period of July 2, 2002 to June 30, 2003. According to Longshore–Pizer, Reagan and Shields never discussed the substance of their critiques with Longshore–Pizer before issuing the evaluations.

In addition, Longshore–Pizer never received the training she requested in computer technology or completing travel authorizations. As for computer training, Longshore–Pizer did not receive training until eight months after starting at CRMHC–Hartford, and the training itself was very basic. The training Longshore–Pizer did receive in completing travel authorizations included Mercier sending emails to Longshore–Pizer and/or Reagan correcting Longshore–Pizer's work.

In the fall of 2003, the CRMHC went through a reorganization. As a result of the reorganization, Longshore–Pizer was transferred to the Quality Assurance Division. There, Michael Levinson became Longshore–Pizer's supervisor. On November 3, Longshore–Pizer filed an Affirmative Action complaint against CRMHC for allegedly discriminating against her. Letter from Longshore–Pizer to Reed

(Nov. 3, 2003), Def. Motion to Dismiss, Exh. 16 at 12. Reed conducted an investigation into Longshore–Pizer's complaints and, on March 21, 2004, issued a report concluding that there was no evidence of race discrimination against Longshore–Pizer. Affirmative Action Report (March 21, 2004), Def. Motion to Dismiss, Exh. 16 at 8–10. Longshore–Pizer's only grievance here is with the veracity of Reed's report. *See* Pl. Rule 56(a)(2) Statement at ¶ 175.

## III. DISCUSSION[3]

### A. Longshore–Pizer's Disparate Treatment Claim

■ This court addresses first Longshore–Pizer's Title VII claim of disparate treatment based on race. Analyzing whether the defendants subjected Longshore–Pizer to disparate termination must be done under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Fitzgerald v. Henderson*, 251 F.3d 345, 356 (2d Cir. 2001). The plaintiff is first required to establish a prima facie case of discrimination. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). A prima facie case for disparate treatment is made out by showing that: 1) the plaintiff is a member of a protected class; 2) the plaintiff performed her job adequately; 3) the plaintiff suffered an adverse employment action; and 4) that the adverse employment action occurred under conditions giving rise to an inference of discrimination. *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089.

■ Once a plaintiff has established a prima facie case, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for its actions. *See id.* Upon the employer's articulation of a nondiscriminatory reason for the employment action, the presumption of discrimination that arises with the establishment of the prima facie case drops out. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The burden then shifts back to the plaintiff to fulfill her ultimate burden of proving that the defendant intentionally discriminated against him in the employment action. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105, (2000). In order to satisfy this burden, the plaintiff may attempt to prove that the legitimate, non-discriminatory reason offered by the defendant was not the employer's true reason, but was a pretext for discrimination. *Id.*

■ A prima facie case combined with a showing that an employer's asserted justification is false is sometimes, but not always, sufficient to permit a discrimination claim to survive summary judgment. *Schnabel v. Abramson*, 232 F.3d 83, 89–91 (2d Cir.2000) (citing *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097). The court must "examin[e] the entire record to determine

---

**3.** For the purposes of this section, the court notes that Longshore–Pizer never submitted a "Disputed Issues of Material Fact" section that Local Rule 56(a)(2) requires. "[F]ailure to comply with the court's rules concerning the appropriate way to oppose the defendants' motion for summary judgment is sufficient reason alone to accept the defendants' list of material facts as undisputed." *Scianna v. McGuire*, 1996 WL 684400 at *2 (D.Conn.

March 21, 1996) (citing *Dusanenko v. Maloney*, 726 F.2d 82, 84 (2d Cir.1984)). Though Rule 56(a)(3) provides this court with discretion to grant the motion for summary judgment because of Longshore–Pizer's omission, the court will take the less drastic approach and merely accept the defendants' material facts as true except to the extent Longshore–Pizer denied these facts with a basis for such denial.

whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Schnabel,* 232 F.3d at 90 (quoting *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097, 147 L.Ed.2d 105). The plaintiff need not show that sex or race was the only factor motivating any adverse employment actions she suffered in order to make a showing of employment discrimination. *See* 42 U.S.C. § 2000e–2(m); *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). "The 'ultimate issue' in an employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,' i.e., a discriminatory reason," regardless of whether the case is presented as one of single or dual motive. *Stratton v. Dep't for the Aging for New York,* 132 F.3d 869, 878 (2d Cir.1997).

The defendants first challenge Longshore–Pizer's prima facie case by asserting that she did not suffer an adverse employment action. Longshore–Pizer disputes this by arguing that she suffered adverse employment actions when the defendants constructively demoted her when she came to Hartford. The defendants allegedly effected this constructive demotion by assigning Longshore–Pizer mainly clerical duties, even though she was an Office Manager; robbing her of supervisory duties; issuing unfairly negative evaluations of her, refusing to properly and/or promptly train her on computers and completing travel authorizations; and generally failing to provide her with adequate support in her transition to CRMHC–Hartford.

▮ The Supreme Court recently pronounced that an adverse employment action must be "materially adverse", in that it would "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White,* —— U.S. ——, ——, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006). Material adversity must be the focus in determining whether an adverse employment action has occurred because "it is important to separate significant from trivial harms." *White,* 126 S.Ct. at 2415. The Supreme Court's language and intent in *White* appear entirely consistent with Second Circuit precedent, which defines an adverse employment action as a "materially adverse change in the terms and conditions of employment [that] is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Fairbrother v. Morrison,* 412 F.3d 39, 56 (2d Cir.2005). Prototypical examples of adverse employment actions include termination, demotion via a reduced wage, salary, or job title, a material loss of benefits, or significantly reduced responsibilities. *Demoret v. Zegarelli,* 451 F.3d 140, 151 (2d Cir.2006) (citation omitted). In the instant case, this court has serious doubts as to whether the events about which Longshore–Pizer complains are actually adverse within the meaning of Second Circuit case law. For the purposes of this motion, however, this court will assume that Longshore–Pizer satisfies this prong of the disparate treatment analysis.

▮ Next, the defendants assert that Longshore–Pizer cannot establish that she suffered adverse employment actions because of her race, the fourth element of the disparate treatment test. This court agrees. To show that the adverse actions she endured at CRMHC–Hartford took place under conditions giving rise to an inference of discrimination, Longshore–Pizer must demonstrate that the defendants "treated [her] less favorably than a similarly situated employee outside [her] protected group." *Graham v. Long Island*

*R.R.*, 230 F.3d 34, 39 (2d Cir.2000). Specifically, Longshore–Pizer must prove that she was "similarly situated in all material respects" to the individuals with whom she compares herself. *Shumway v. United Parcel Serv. Inc.*, 118 F.3d 60, 64 (2d Cir.1997). The test for materiality asks whether Longshore–Pizer and the individuals against whom she compares herself were subjected to the same workplace standards and whether the conduct at issue was of comparable severity. *Graham*, 230 F.3d at 40 (citing *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 96 (2d Cir.1999)).

■■■ Mercier, a white female, is the only CRMHC–Hartford employee against whom Longshore–Pizer compares herself.[4] Longshore–Pizer admits that, when Mercier was the officer manager at CRMHC–Hartford, her job responsibilities became increasingly more clerical in rough proportion to the decreasing number of clerical staff available. Longshore–Pizer admits that she was the only clerical employee in either Acute Care or SSD. In fact, Longshore–Pizer has put forward no evidence that her job responsibilities, though perhaps altered from what they had been in New Haven, were recognizably different from what Mercier had been doing all along in Hartford. Longshore–Pizer has failed even to articulate Mercier's job responsibilities while she was an office manager. Mercier's undisputed responsibilities as office manager foreclose any attempt by Longshore–Pizer to establish that Mercier was given more substantial responsibilities as office manager. *See, e.g.,* Def. Rule 56(a)(1) Statement at ¶ 20 (describing how Mercier was assigned to clerical support for the Special Services division in 2002 when its secretary went out on medical leave).

With regard to the training the defendants supposedly denied to Longshore–Pizer, it is undisputed that Mercier had considerable experience in computer systems administration and travel authorization. Concerning travel authorization, there is no dispute that, when Mercier trained employees on how to complete travel authorization forms, the process included 30–45 minutes of verbal instruction and written feedback. Rule 56(a)(1) Statement at ¶ 130. Instead, Longshore–Pizer contends that she never received in-person training on the completion of travel reimbursements from Mercier or anyone else. Rule 56(a)(2) Statement at ¶ 135. The defendants maintain that Mercier provided Longshore–Pizer with verbal instruction on the procedure, as well as written instructions for reference. Rule 56(a)(1) Statement at ¶ 135. Longshore–Pizer does admit that, after she completed travel authorization forms, Mercier provided instructions on proper completion of the forms via email. Rule 56(a)(2) Statement at ¶ 147. According to Longshore–Pizer, however, these email instructions were inconsistent with the division's online instructions for completing travel reimbursement, as well as the instructions Mercier gave to other staff members. *Id.* In sum, the brunt of Longshore–Pizer's grievance appears to be that she was not trained appropriately or promptly to complete travel reimbursement forms. *See* Rule 56(a)(2) Statement at ¶ 83.

---

**4.** Longshore–Pizer mentions in her Response that Janet Theriault, one of her subordinates in Hartford, was allowed to represent clerical staff in the educational committee. Pl. Response at 10. To support this assertion, Longshore–Pizer cites to her deposition. *Id.*

Longshore–Pizer did not include this excerpt from her deposition, and there is no other evidence in the record concerning Theriault's employment history. Therefore, this court is unable to ascertain whether Theriault is an appropriate comparison employee.

Even if this court were to conclude that Longshore–Pizer has put forward evidence indicating that her training for travel authorization forms was deficient, there is nothing in the record addressing the training received, as opposed to the experience gained, by Mercier or any other similarly situated employee. Undisputed evidence in the record does indicate that Mercier trained numerous employees on travel reimbursements prior to Longshore–Pizer's arrival at CRMHC–Hartford in 2003. Rule 56(a)(1) Statement at ¶ 129. The record is silent, however, as to how CRMHC–Hartford handled travel reimbursement training after Longshore–Pizer began work in Hartford. With no evidence showing how the training she received in travel reimbursements differed from other similarly situated employees, Longshore–Pizer cannot create a material issue of fact on this point.

Similar difficulties confound Longshore–Pizer's claim that she should have received more extensive computer training earlier in her tenure at CRMHC–Hartford. Most damaging is that Longshore–Pizer has put forward no evidence as to how long it was before Mercier was able to obtain specialized training in this area. The record does show that Mercier had over 2, 500 hours of training in computer systems administration. Def. Rule 56(a)(1) Statement at ¶ 17. Absent an evidentiary showing from Longshore–Pizer, this court refuses to assume that Mercier obtained this volume of training over a period of time comparable to Longshore–Pizer's stay in CRMHC–Hartford. In fact, from the undisputed evidence in the record, it appears that Longshore–Pizer could not have had the same opportunity for training as Mercier, regardless of her race. Mercier apparently received her training in computer systems administration from CRMHC's telecommunications office. Def. Rule 56(a)(1) Statement at ¶ 17. The telecommunications of-fice closed due to budget cuts in 2002, the year before Longshore–Pizer came to Hartford. There is no indication that it has since re-opened. *Id.* Longshore–Pizer's submissions are silent concerning any employees who received computer training as significant as Mercier did after the telecommunications office closed.

The next adverse employment action that Longshore–Pizer asserts is that Shields and Reagan made false and derogatory statements about Longshore–Pizer's job performance in her June 2003 annual evaluation. Longshore–Pizer also impugns the annual evaluation by arguing that she had no warning about Shields' and Reagan's views prior to the evaluation. Beyond such assertions, though, there is nothing in the record to suggest that Longshore–Pizer's evaluation was in any way influenced by discrimination.

Lastly, Longshore Pizer continually suggests that her move from New Haven to Hartford was discriminatory in and of itself. According to Longshore–Pizer, she was the only black employee in the New Haven office and the only employee to receive a layoff notice. Her attempt to transform this circumstance into racial discrimination is purely conclusory. Nowhere does Longshore–Pizer take issue with the fact that DMHAS based layoffs exclusively on the terms of a collective bargaining agreement with the union. That agreement made seniority the sole criteria for selecting which employees would receive notices and determining the manner in which laid off employees could bump other co-workers. Longshore–Pizer also does not attempt to establish that DMHAS inappropriately determined her seniority, or that it went outside the terms of the collective-bargaining agreement to place her into a new office. Thus, this court rejects the suggestion, unsupported by the evidence, that Longshore–Pizer's

arrival in Hartford was in any way due to race.

Based on these factors, the court concludes that there is no evidence upon which a jury could find that Longshore–Pizer's treatment at CRMHC was either disparate or discriminatory. The defendants' Motion for Summary Judgment on this issue is therefore granted.

## B. Longshore–Pizer's Retaliation Claim

The defendants next challenge Longshore–Pizer's contention that the defendants retaliated against her for protesting discrimination in the CHRO complaint she filed in 1999 while still in New Haven. Because this complaint took place over two years prior to Longshore–Pizer's arrival in Hartford, the defendants assert that there is no reasonable ground upon which to conclude that Longshore–Pizer's treatment at CRMHC–Hartford was in any way related to her actions in CRMHC–New Haven. This court agrees.

Under Title VII, a plaintiff alleging retaliation must establish "participation in a protected activity known to the defendant; an employment action disadvantaging the plaintiff; and a causal connection between the protected activity and the adverse employment action." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir.1998). There are several ways in which a plaintiff may establish proof of causation. Most relevant here is that causation may be proven "*indirectly* by showing that the protected activity was followed closely by discriminatory treatment." *DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir.1987). The Supreme Court has cautioned that, when plaintiffs attempt to show causation through temporal proximity, that proximity "must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273,

121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir.2001)).

In the instant case, Longshore–Pizer does not dispute that almost four years passed between her 1999 CHRO complaint and her 2003 reassignment to CRMHC–Hartford. Instead, Longshore–Pizer, pointing to case-law from the Third Circuit, argues that there has been an "*intervening pattern of antagonism*" sufficient to support a finding of causation. Pl. Opposition at 23 (quoting *Robinson v. S.E. Pennsylvania Transport. Auth.*, 982 F.2d 892, 894 (3rd Cir.1993)). This intervening pattern, Longshore–Pizer argues, is evidenced by the fact that she continued to protest discrimination after she moved to CRMHC–Hartford. Longshore–Pizer's protests apparently came in the form of her complaints about not being properly trained, the collective bargaining grievances she filed in reference to her unfair evaluations, and the complaint of discrimination she lodged with Reed.

A key, first observation in this regard is that Longshore–Pizer's complaints about her training and performance evaluations are not protected activities under Title VII. By its terms, Title VII forbids actions taken on the basis of race that "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2(a)(1). At the time she made her complaints in reference to training and evaluations, there is nothing in the record to suggest that Longshore–Pizer was protesting the type of discrimination that Title VII sanctions. Since these actions are not protected activities, Longshore–Pizer may not rely upon them to establish an intervening pattern of antagonism.

Longshore–Pizer's affirmative action complaint is also irrelevant to her claim of retaliation. Although Longshore–Pizer's complaint to Reed in November of 2003 concerning racial discrimination is most certainly protected activity, all of the treatment about which Longshore–Pizer complained concerning her assignment of duties, lack of support, improper evaluations, and inadequate training occurred before she made this charge. Looking to the entire record, there is undisputed evidence that Longshore Pizer transferred to the Quality Assurance Division at or around the same time as her affirmative action complaint. While such an action could be viewed as retaliatory in certain contexts, Longshore–Pizer never attempts to argue that her transfer to Quality Assurance constituted an adverse employment action. Rather, Longshore–Pizer admits that her transfer to Quality Assurance was due a CRMHC reorganization. Rule 56(a)(2) Statement at ¶ 167. As Longshore–Pizer presents no evidence that she suffered an adverse action *after* she filed her affirmative action complaint, the complaint cannot form the basis of a retaliation claim.

■ As the only protected activity upon which Longshore–Pizer relies to establish her retaliation claim is the 1999 CHRO complaint, she is unable to prove the "continuum of [protected] activity" necessary for causation when a significant amount of time elapses between the original protected activity and alleged retaliation. *See Jackson v. Health Resources of Rockville*, 357 F.Supp.2d 507, 518 (D.Conn. 2005) (discussing *Shaw v. Shell Oil Prods. Co.*, 119 F.Supp.2d 62, 68–69 (D.Conn. 2000)). Therefore, this court cannot find causation given how temporally remote Longshore–Pizer's 1999 CHRO complaint was in relation to her 2003 transfer to CRMHC–Hartford. *See Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir.

1990) (failing to find a causal connection where the time between the protected activity and the adverse employment action was three months); *see also Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 130 (2d Cir.1996) (finding no evidence of a causal connection where the protected action took place between one and three months before plaintiff was discharged). Given Longshore–Pizer's inability to come forward with any evidence supporting causation in her prima facie case, this court grants summary judgment on the retaliation claim.

**C. Longshore–Pizer's Hostile Environment Claim**

The final issue is the defendants' claim that Longshore–Pizer cannot prove her Title VII hostile environment claim. Their major contention on this point is that there is no evidence suggesting that Longshore–Pizer experienced verbal or physical conduct of a racial nature. After considering the facts before it, this court once again agrees.

■ To prevail on a hostile work environment claim, a plaintiff must establish that her workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations omitted). In *Harris*, the Supreme Court outlined a two part test for proving a hostile work environment. The first part asks whether the conduct in question was objectively hostile or, in other words, whether the employer's actions created "an environment that a reasonable person would find hostile or abusive." *Harris*, 510 U.S. at 21, 114 S.Ct. 367. Determining if the work environment was objectively hostile is ac-

complished by examining the totality of the circumstances. *Williams v. County of Westchester*, 171 F.3d 98, 100 (2d Cir. 1999). A nonexclusive list of the factors a court may consider includes "the frequency and severity of the discriminatory conduct, whether such conduct is physically threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's work performance." *Williams*, 171 F.3d at 100 (citing *Harris*, 510 U.S. at 23, 114 S.Ct. 367). No single factor is required or dispositive. *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 605 (2d Cir.2006). If the plaintiff can make this showing, she must then satisfy the court that she subjectively perceived the work environment as abusive. *Id.* at 21–22, 114 S.Ct. 367. The demonstrated effects that the work environment had on the plaintiff's mental well being are very pertinent to deciding whether the plaintiff actually viewed her surroundings as intolerable. *Id.* at 23, 114 S.Ct. 367.

By and large, a plaintiff cannot establish a hostile work environment if the incidents complained of are isolated, unless those incidents "are of sufficient severity to alter the terms and conditions of employment." *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir.2006) (citing *Patterson v. County of Oneida*, 375 F.3d 206, 227 (2d Cir.2004)). In addition, the Second Circuit has made explicit the Supreme Court's underlying requirement that a plaintiff must adduce "a specific basis for imputing the conduct creating the hostile work environment to the employer." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir.2004) (citing *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)).

■ The question of whether a work environment is hostile under Title VII and Section 1983 is primarily one of fact. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir.2001). Thus, the court's role on a motion for summary judgment is inherently limited. It must restrain itself only to deciding "whether a reasonable factfinder could conclude ... that the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*." *Schiano* 445 F.3d at 600 (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir.2000)). As the Second Circuit has warned, "[a]n Article III judge is not a hierophant of social graces," and there is no defensible justification for the belief that courts are superior to juries in demarcating the boundary between merely inappropriate conduct and legally abusive racism. *See Gallagher v. Delaney*, 139 F.3d 338, 347 (2d Cir.1998).

■ Despite the constrained role this court plays, Longshore–Pizer's claims fall short of even suggesting a racially hostile work environment. Nothing in the record indicates that any conduct by CRMHC employees toward Longshore–Pizer was of a racial nature. In arriving at this conclusion, the court is especially struck by the fact that Longshore–Pizer does not once cite to the record in her Opposition to Summary Judgment to support her hostile environment claim. *See* Pl. Opposition at 27–28. The court therefore grants summary judgment on the claim.

## IV. CONCLUSION

Based on the foregoing analysis, the defendants' Motion for Summary Judgment [Doc. No. 44] is GRANTED. The clerk is hereby directed to close the case.

**SO ORDERED.**